No. 24-13751

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

AMERICAN SECURITIES ASSOCIATION,

*Petitioner*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

---

On Petition for Review of an Order of the
United States Securities and Exchange Commission
Release No. 34-101118; File No. SR-MSRB-2024-01

---

### PETITIONER'S OPENING BRIEF

---

J. Michael Connolly
Steven C. Begakis
Zachary P. Grouev
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
zach@consovoymccarthy.com

*Counsel for Petitioner*
Date: February 27, 2025          *American Securities Association*

*American Securities Association v. United States Securities and Exchange Commission*
No. 24-13751

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## AMENDED CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, Petitioner American Securities Association provides the following certificate of interested persons:

The undersigned counsel of record certify that the following listed persons and entities as described in 11th Circuit Rule 26.1-2 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **American Securities Association**, Petitioner.

2. **Barbero, Megan**, counsel for Respondent United States Securities and Exchange Commission.

3. **Begakis, Steven C.**, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

4. **Connolly, J. Michael**, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

5. **Financial Industry Regulatory Authority**.

6. **Finnell, Jeffrey B.**, counsel for Respondent Securities and Exchange Commission.

*American Securities Association v. United States Securities and Exchange Commission*
No. 24-13751

6.  **Grouev, Zachary P.**, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

7.  **Hardin, Tracey A.**, counsel for Respondent United States Securities and Exchange Commission.

8.  **Kennedy, Jordan A.**, counsel for Respondent United States Securities and Exchange Commission.

9.  **Kry, Robert K.**, MoloLamken LLP, counsel for Proposed Intervenor Municipal Securities Rulemaking Board.

10. **Matro, Daniel E.**, counsel for Respondent United States Securities and Exchange Commission.

11. **Municipal Securities Rulemaking Board**.

12. **United States Securities and Exchange Commission**, Respondent.

13. **Robert W. Baird & Co., Inc.,** member of Petitioner American Securities Association.

No publicly traded company or corporation has an interest in the outcome of the case. Petitioner will file an amended certificate of interested persons should it become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

*American Securities Association v. United States Securities and Exchange Commission*
No. 24-13751

Dated: February 27, 2025

Respectfully submitted,

 */s/ J. Michael Connolly*
J. Michael Connolly
Steven C. Begakis
Zachary P. Grouev
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
zach@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

*American Securities Association v. United States Securities and Exchange Commission*
No. 24-13751

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, undersigned counsel hereby certifies that ASA is a nonprofit trade association that represents the wealth management and capital markets interests of regional financial services firms. ASA members are small and regional financial services companies who advise Americans how to create and preserve wealth; provide Main Street businesses with access to capital and advisory services; raise capital for schools, hospitals, cities, and states; and work with institutional investors to increase investment returns. Counsel further certifies that it has no parent corporation and that no publicly held corporation has a 10% or greater ownership interest in ASA.

Dated: February 27, 2025

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
Steven C. Begakis
Zachary P. Grouev
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
zach@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

C-4 of 4

## ORAL ARGUMENT STATEMENT

This Court should hear oral argument. This case presents important constitutional questions about the validity of a significant order of the U.S. Securities and Exchange Commission. The Order shortens the timeframe to report trades to the Municipal Securities Rulemaking Board to one minute. Petitioner argues that the Order must be set aside because the MSRB is unconstitutionally structured in violation of the private nondelegation doctrine, Article II and the separation of powers, and the Appointments Clause. Whether the MSRB's quasi-private, quasi-public regulatory structure is unconstitutionally structured is an issue of first impression in this Court with significant implications for the separation of powers and accountability in government.

This case also raises important statutory questions. Although small broker-dealer firms were diligently complying with the MSRB's previous fifteen-minute reporting rule, commenters warned that these firms lacked the technological capacity to comply with the new one-minute rule. The SEC issued the Order anyway, threatening to put these broker-dealers out of business if they cannot comply. In violation of the Administrative Procedure Act and the Exchange Act, the Order does not weigh the costs and benefits of the one-minute rule, and it does not adequately assess how the rule discriminates among broker-dealers, imposes unnecessary and inappropriate burdens on competition, and burdens small broker-dealers. Oral argument would help the Court address these issues and decide whether the Order must be set aside.

# TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT...................................................................i

TABLE OF CONTENTS............................................................................ii

TABLE OF AUTHORITIES.......................................................................iii

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ...............................................................3

STATEMENT OF THE ISSUES..................................................................4

STATEMENT OF THE CASE.....................................................................4

A.    The Municipal Securities Market ....................................................4

B.    The Municipal Securities Rulemaking Board ...................................5

C.    The MSRB's Rule Change for Reporting Municipal Securities ...........11

D.    The SEC Order Approving the Proposed Rule ..................................16

STANDARD OF REVIEW .......................................................................18

SUMMARY OF ARGUMENT....................................................................21

ARGUMENT ........................................................................................23

I.    The Order must be set aside because the MSRB is unconstitutionally structured................................................................................... 23

II.   The SEC failed to adequately assess the costs and benefits. ................. 37

III.  The SEC failed to adequately assess whether the one-minute rule permits unfair discrimination between broker-dealers. ...................................... 42

IV.   The SEC failed to adequately assess whether the Order imposes unnecessary or inappropriate burdens on competition. ................................................ 44

V.    The SEC failed to adequately assess the Order's impact on small entities. ......... 46

VI.   The Court should vacate the Order. ................................................. 49

CONCLUSION .................................................................................... 51

# TABLE OF AUTHORITIES

## Cases

*Allstates Refractory Contractors, LLC v. Su,*
   79 F.4th 755 (6th Cir. 2023) ........................................................ 45

*Alpine Secs. Corp. v. FINRA,*
   121 F.4th 1314 (D.C. Cir. 2024) ........................... 28, 32-33, 36-37

*Am. Petrol. Inst. v. SEC,*
   953 F. Supp. 2d 5 (D.D.C. 2013) ............................................44-46

*ASA v. SEC,*
   No. 24-13750 (11th Cir.) ............................................................. 18

*Bidi Vapor LLC v. FDA,*
   47 F.4th 1191 (11th Cir. 2022) ................................................... 50

*Black Warrior Riverkeeper, Inc. v. USACE,*
   781 F.3d 1271 (11th Cir. 2015) ................................................... 49

*Bloomberg LP v. SEC,*
   45 F.4th 462 (D.C. Cir. 2022) ...................... 18-19, 42, 44-47

*Blount v. SEC,*
   61 F.3d 938 (D.C. Cir. 1995) ...................... 7, 10, 21, 25, 33, 36

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ................................................................. 32, 35

*Bus. Roundtable v. SEC,*
   647 F.3d 1144 (D.C. Cir. 2011) ...........................20, 37-41, 50

*Campbell v. Universal City Dev. Partners, Ltd.,*
   72 F.4th 1245 (11th Cir. 2023) ................................................... 45

*Carr v. Saul,*
   593 U.S. 83 (2021) ...................................................................... 21

*Chamber of Com. of U.S. v. SEC,*
   412 F.3d 133 (D.C. Cir. 2005) .........................................37-39, 41

*Chippewa & Flambeau Improvement Co. v. FERC,*
   325 F.3d 353 (D.C. Cir. 2003) ................................................... 44

*Cody v. Kijakazi,*
    48 F.4th 956 (9th Cir. 2022) ........................................................ 50

*Consumers' Rsch., Cause Based Comm., Inc. v. FCC,*
    88 F.4th 917 (11th Cir. 2023) ....................................... 10, 24-29, 36

*Data Mktg. P'ship, LP v. DOL,*
    45 F.4th 846 (5th Cir. 2022) ........................................................ 49

*Dep't of Transp. v. Ass'n of Am. RRs.,*
    575 U.S. 43 (2015) ............................................ 1-2, 24, 28-29, 32

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010) ...................................................... 7, 26, 30-32

*Gundy v. United States,*
    588 U.S. 128 (2019) ............................................................... 23-24

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .................................................................... 4

*Ins. Mktg. Coal. Ltd. v. FCC,*
    127 F.4th 303 (11th Cir. 2025) ............................................... 49-50

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022) ................................................... 7, 50

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.,*
    741 F.3d 1309 (D.C. Cir. 2014) .................................. 19, 46, 48-49

*Lucia v. SEC,*
    585 U.S. 237 (2018) .......................................................... 35-36, 50

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) .................................................. 37, 41

*Michigan v. EPA,*
    576 U.S. 743 (2015) ............................................... 37-38, 44, 46

*Mistretta v. United States,*
    488 U.S. 361 (1989) .................................................................. 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................. 19, 41

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
   53 F.4th 869 (5th Cir. 2022) ........................................................ 24

*Nat'l Tel. Coop. Ass'n v. FCC,*
   563 F.3d 536 (D.C. Cir. 2009) ...................................................47-48

*NetCoalition v. SEC,*
   615 F.3d 525 (D.C. Cir. 2010) .............................. 19, 41-42, 44, 46

*Prairie Band Potawatomi Nation v. Yellen,*
   63 F.4th 42 (D.C. Cir. 2023) ........................................................ 40

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
   374 F.3d 1209 (D.C. Cir. 2004) ................................................... 38

*S. Offshore Fishing Ass'n v. Daley,*
   995 F. Supp. 1411 (M.D. Fla. 1998) ............................................ 47

*Scottsdale Cap. Advisors Corp. v. FINRA,*
   678 F. Supp. 3d 88 (D.D.C. 2023) ............................................... 33

*SEC v. City of Rochester,*
   731 F. Supp. 3d 455 (W.D.N.Y. 2024) ...............................7, 24, 36

*SEC v. Jarkesy,*
   603 U.S. 109 (2024) .......................................................................7

*Sossamon v. Texas,*
   563 U.S. 277 (2011) ..................................................................... 45

*State of Colo. ex rel. Colorado State Banking Bd. v. Resol. Tr. Corp.,*
   926 F.2d 931 (10th Cir. 1991) ..................................................... 47

*Stone & Webster Constr., Inc. v. DOL,*
   684 F.3d 1127 (11th Cir. 2012) ................................................... 19

*Susquehanna Int'l Grp., LLP v. SEC,*
   866 F.3d 442 (D.C. Cir. 2017) ...............................................19, 38

*Trump v. United States,*
   603 U.S. 593 (2024) ..................................................................... 29

*U.S. Telecom Ass'n v. FCC,*
   400 F.3d 29 (D.C. Cir. 2005) ...................................................... 48

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) ................................................................................33-34

*United States v. Donziger,*
  38 F.4th 290 (2d Cir. 2022) .............................................................35-36

*United States v. Germaine,*
  99 U.S. 508 (1878).................................................................................. 35

*United States v. Maurice,*
  26 F. Cas. 1211 (C.C.D. Va. 1823) .................................................... 36

*WildEarth Guardians v. EPA,*
  770 F.3d 919 (10th Cir. 2014) ............................................................ 21

**Statutes**

15 U.S.C. §78b ............................................................................................ 46

15 U.S.C. §78c .................................................................... 8, 17, 20, 25-26, 37

15 U.S.C. §78d-1 ..........................................................................................3

15 U.S.C. §78o-4 .......................................6-10, 16-17, 19-20, 25-27, 30, 35-36, 42-46

15 U.S.C. §78o-4a .................................................................................... 10

15 U.S.C. §78s ....................................................................................8-9, 25-26

15 U.S.C. §78y ........................................................ 3-4, 7, 18, 20-21, 26, 49

29 U.S.C. §160 ........................................................................................ 20

29 U.S.C. §660 ........................................................................................ 20

30 U.S.C. §816 ........................................................................................ 20

5 U.S.C. §603 ..........................................................................................47-48

5 U.S.C. §604 ..........................................................................................47-48

5 U.S.C. §706 .................................................................... 18-19, 37, 41, 44, 49

Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................6

vi

Pub. L. No. 94-29, 89 Stat. 97 (1975) ............................................................. 6, 36

**Other Authorities**

Andrew Ackerman & Heather Gillers, *One of the Most Lucrative Regulatory Jobs in Washington Is Now Open*, Wall St. J. (Aug. 13, 2019), bit.ly/4hUdHwb .......... 27

FINRA Rule 0151, *Coordination with the MSRB*, perma.cc/DMF5-ZQ7L ...................... 9

FINRA Rule 8310, perma.cc/XB4C-HZ7P ...................................................... 11

FINRA, *Municipal Securities*, perma.cc/7S3A-MSU3 ........................................... 4

FINRA, *Our History*, perma.cc/VF5E-KXUV .................................................... 5

FINRA, *Sanction Guidelines* (Mar. 2024), perma.cc/4ZN4-ETYQ .............................. 11

FINRA, *Updating TRACE Reporting Timeframes* (Feb. 5, 2025), perma.cc/BXZ4-LM83 ........................................................................ 18

MSRB Regulatory Notice 2022-07, *Comments*, perma.cc/PKD9-E327 ......................... 12

MSRB Regulatory Notice 2022-07, *Request for Comment* (Aug. 2, 2022), perma.cc/7C6C-RGZB ...................................................................... 12

MSRB, *2024 Annual Report*, perma.cc/MPW9-JDMJ ........................................ 10

MSRB, *About the MSRB*, perma.cc/DR6P-M5HT ............................................. 9

MSRB, *Delayed Announcement of Effective Date for Amendment to MSRB Rule G-14 to Shorten Timeframe for Reporting Transactions in Municipal Securities* (Feb. 5, 2025), perma.cc/FC86-TTQQ ............................................... 18, 50

MSRB, *Fiscal Year 2025 Budget*, perma.cc/8YVM-VG3X ................................... 27

MSRB, *Form 990* (2023), perma.cc/H9JS-RMN5 .......................................... 30

MSRB, *Rule Book* (Oct. 1, 2024), perma.cc/D4L4-3FV2 ................ 6-8, 10-12, 25, 29-30

MSRB, *Self-Regulation and the Municipal Securities Market* (Jan. 2018), perma.cc/G8BM-QNB7 ..................................................................... 9

MSRB, *Strategic Plan: Fiscal Years 2022-2025* (2021), perma.cc/6U9D-CPG4 ............... 27

MSRB, *The Role and Jurisdiction of the MSRB*, perma.cc/ZZC6-TYFW .......................... 25

MSRB, *The Secondary Market Process*, perma.cc/Q265-37FK ...............................5

MSRB, *Understanding the Annual Rate Card*, perma.cc/U6KR-E34B ............................. 10

Richard E. Brodsky, *"Something Called the 'Municipal Securities Rulemaking Board'": Unexamined Issues of Constitutionality*, 8 Am. Univ. Bus. L. Rev. 23 (2019) ................................................................................... 6-7, 25, 29

Robert Colby, *Testimony Before the Subcommittee on Capital Markets and Government Sponsored Enterprises Committee on Financial Services*, FINRA (Sept. 22, 2016), perma.cc/9LV9-UF3M ..........................................................9

SEC Hist. Soc'y, *The Great Compromise: Adding a Rail*, perma.cc/3P8S-RFA9 ...............6

SEC Hist. Soc'y, *The Municipal Securities Rulemaking Board Gallery on Municipal Securities Regulation: Introduction* (Dec. 1, 2015), perma.cc/9MMC-T4XV ...........................................................................5

SEC Hist. Soc'y, *Two Centuries of Municipal Finance: Mortgaging the Future*, perma.cc/8V82-BH3Q ...........................................................................5

The Federalist No. 77 (A. Hamilton) ............................................................... 34

Vanguard, *Roads, Schools, and Hospitals: A Brief Tour of the Municipal Bond Market* (Apr. 2024), perma.cc/8QRB-CGX3 ...............................................5

**Regulations**

17 C.F.R. §200.30-3 ........................................................................... 32

**Constitutional Provisions**

U.S. Const. art. I, §1 ...................................................................... 2, 23

U.S. Const. art. II, §1, cl.1 .............................................................. 2, 23

U.S. Const. art. II, §2, cl.2 ............................................................. 7, 34-35

**INTRODUCTION**

The Municipal Securities Regulation Board is a quasi-public, quasi-private regulatory entity that has no place in our Constitutional structure. On its face, the MSRB looks like a classic federal agency. The MSRB was established by Congress in 1975 to regulate the trading of municipal securities. The MSRB writes the rules that govern every aspect of the municipal securities market, including who can trade them, and when, where, and how they can be traded. When the MSRB's rules are violated, the MSRB actively participates in enforcing them through sanctions and penalties. And the MSRB funds itself through tens of millions of dollars in fees and fines that regulated entities are required by statute to pay.

But while the MSRB wields classic governmental power, it lacks the "accountability checkpoints" that ensure that its power is wielded by individuals who are answerable to the people. *Dep't of Transp. v. Ass'n of Am. RRs.*, 575 U.S. 43, 61 (2015) ("*Amtrak*") (Alito, J., concurring). The MSRB was established not as a federal agency, but as a Virginia nonprofit corporation. The MSRB is controlled by a 15-member Board of Directors who are appointed to those positions by other members of the MSRB. So MSRB Directors wield significant governmental power, but they are not nominated by the President and confirmed by the Senate, or even appointed by any Heads of Departments, as required by the Appointments Clause. And the MSRB is not subject to adequate control by the Executive branch through the removal power, since MSRB Directors can be removed by the SEC only for serious misconduct (after a full hearing

1

that itself is subject to judicial review), and SEC Commissioners themselves have for-cause removal protection. This double insulation from removal means that the MSRB Directors wield significant governmental powers without oversight from democratically accountable officials.

All of this is abhorrent to our Constitutional structure. When it comes to legislative and executive powers, the Constitution is unwavering: "All legislative Powers" are vested in Congress, art. I, §1, and "[t]he executive Power" is vested solely in the President, art. II, §1, cl.1. Because "[l]iberty requires accountability," it would "dash the whole [constitutional] scheme" if unaccountable individuals could exercise legislative or executive power. *Amtrak*, 575 U.S. at 57, 61 (Alito, J., concurring). Yet the MSRB has been permitted to blow past these constitutional guardrails for decades.

The SEC order under review here epitomizes the problems with the MSRB. Since 2005, the MSRB has required broker-dealers to report trades in municipal securities to the MSRB within 15 minutes of the trade. But the MSRB recently announced that it would dramatically shorten this period to only one minute, despite no evidence of problems with the longstanding reporting regime and fierce opposition from the regulated community. After receiving public comments on its proposal, the MSRB presented its proposed rule to the SEC for approval. Under the Exchange Act, the SEC can only approve or disapprove the MSRB's proposed rule. And in a cursory order, the SEC signed off on the proposed rule, deferring to the MSRB's policy judgments along the way.

The SEC's order must be set aside. Fundamentally, the Order is the product of an unconstitutionally structured entity and thus cannot stand. The MSRB violates the private nondelegation doctrine because it improperly exercises quasi-legislative powers and significant executive powers; it violates Article II and the separation of powers because it is unconstitutionally insulated from executive control; and its Directors were appointed in violation of the Appointments Clause. The Order also violates the APA and the Exchange Act for a host of other reasons. The SEC failed to adequately assess the Order's costs and benefits, permitted unfair discrimination between broker-dealers, imposed unnecessary and inappropriate burdens on competition, and harmed small entities without explanation. The Order should be vacated and set aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. §78y(a), which permits a person aggrieved by an SEC order to petition for review in the applicable Court of Appeals within 60 days of the order's entry. On September 20, 2024, the SEC's Office of Municipal Securities issued an order approving the one-minute rule "[f]or the Commission, pursuant to delegated authority." Appendix ("App.") 177. Under the Exchange Act, that order was "deemed the action of the Commission" "for all purposes, including appeal or review thereof." 15 U.S.C. §78d-1(c); *see also* Dkt. 25, ASA's Opp. to Mot. to Dismiss. On November 15, 2024, ASA timely petitioned for review requesting that the Order be set aside. Dkt. 1-2. ASA has standing because "its members would otherwise have standing to sue in their own right," the "interests it

3

seeks to protect are germane to the organization's purpose," and "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see* Dkt. 25-2, Iacovella Decl. ¶¶3-8, 12-13. Venue is proper in this Circuit because ASA's principal place of business is in Florida. Dkt. 25-2, Iacovella Decl. ¶5; 15 U.S.C. §78y(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the Order should be set aside because the MSRB is unconstitutionally structured.

2.  Whether the Order should be set aside because the SEC failed to adequately assess (a) the Order's costs and benefits; (b) whether the Order permits unfair discrimination between broker-dealers; (c) whether the Order imposes unnecessary or inappropriate burdens on competition; and (d) the Order's significant impact on small entities.

## STATEMENT OF THE CASE

### A.    The Municipal Securities Market

Municipal securities are one of the many financial instruments purchased by American investors. They consist of "municipal bonds issued by states, cities, counties and other governmental entities to raise money to build roads, schools and a host of other projects for the public good." FINRA, *Municipal Securities*, perma.cc/7S3A-MSU3. Municipal securities "are typically sold in minimum increments of $5,000, pay interest on a semi-annual basis, and have maturities that range from less than one year to

4

30 years." *Id.* With roughly $4 trillion in bonds outstanding, municipal securities are the fourth-largest component of the U.S. fixed-income market. *See* Vanguard, *Roads, Schools, and Hospitals: A Brief Tour of the Municipal Bond Market* 2 (Apr. 2024), perma.cc/8QRB-CGX3. Municipal securities are not traded on stock exchanges but are primarily sold on a secondary market through over-the-counter transactions. *See* MSRB, *The Secondary Market Process*, perma.cc/Q265-37FK.

Though municipal bonds have existed since before the American Revolution, "[t]hrough two centuries of municipal finance, legislators assumed that participants in the bond market knew their business, so regulation was light." SEC Hist. Soc'y, *The Municipal Securities Rulemaking Board Gallery on Municipal Securities Regulation: Introduction* (Dec. 1, 2015), perma.cc/9MMC-T4XV. An important aspect of this light federal touch was that municipal securities were not directly subject to the "cooperative regulation" scheme established in the 1930s, which transformed industry groups like the National Association of Securities Dealers (predecessor to the Financial Industry Regulatory Authority, or FINRA), into quasi-private, quasi-public regulators whose rules carried the force of federal law. *Compare id.*, *with* FINRA, *Our History*, perma.cc/VF5E-KXUV.

## B.    The Municipal Securities Rulemaking Board

This centuries-old approach to municipal finance came to an end in the 1970s after New York City taxed and spent its way into a minor bond scandal. *See* SEC Hist. Soc'y, *Two Centuries of Municipal Finance: Mortgaging the Future*, perma.cc/8V82-BH3Q. In 1975, Congress amended the Exchange Act to "provide for the regulation of brokers,

dealers[,] and banks trading in municipal securities." Pub. L. No. 94-29, 89 Stat. 97 (1975).

Congress wanted to regulate the trading of municipal securities. But unlike in the 1930s, there was no preexisting municipal securities organization for the government to co-opt. Instead of assigning this regulatory function to a preexisting federal agency (like the SEC), Congress took the curious step of creating a quasi-private, quasi-public regulatory body. Congress instructed the SEC to "establish a Municipal Securities Rulemaking Board." *Id.* §13; *see* SEC Hist. Soc'y, *The Great Compromise: Adding a Rail*, perma.cc/3P8S-RFA9 (discussing the "great compromise" between the industry, the SEC, and elected legislators). The MSRB was subsequently established as a Virginia nonprofit corporation. *See* Richard E. Brodsky, *"Something Called the 'Municipal Securities Rulemaking Board'": Unexamined Issues of Constitutionality*, 8 Am. Univ. Bus. L. Rev. 23, 25 & n.6, 32-35 (2019) ("*Unexamined Issues*") (explaining the history of the MSRB).

The fifteen Directors on the MSRB were "initially … appointed by the [SEC]." Pub. L. No. 94-29, §13; *see* 15 U.S.C. §78o-4(b)(1) (1975). But after that, Congress took away the SEC's power to appoint the Directors. *See id.*; Pub. L. No. 111-203, §975, 124 Stat. 1376, 1916 (2010). MSRB Directors are now elected by the Directors themselves and serve "for a term of 3 years." 15 U.S.C. §78o-4(b)(1); *see also id.* (identifying the types of individuals who may serve on the Board); MSRB, *Rule Book* 391 (Oct. 1, 2024), perma.cc/D4L4-3FV2 (Rule A-3, *Board Membership: Composition, Elections, Removal, Compensation*). Today, all the Directors are appointed by the MSRB

6

"without any involvement by the SEC or any other government agency." Brodsky, *Unexamined Issues*, 8 Am. Univ. Bus. L. Rev. at 35. Thus, despite wielding power that can generally be exercised only by "Officers of the United States" under the Appointments Clause, MSRB Directors are not appointed by the President, the head of an executive department, or a court of law. *See* U.S. Const. art. II, §2, cl.2.

Neither the President nor the SEC has adequate removal power to control the MSRB. The SEC can remove a Director only if "the Commission finds, on the record after notice and opportunity for hearing," that the Director "has willfully … violated" the law, the SEC's rules, or the MSRB's rules, or has otherwise "abused his authority." 15 U.S.C. §78o-4(c)(8). And even that determination is subject to judicial review. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 502 (2010) (citing 15 U.S.C. §78y(a)(1)). Thus, the SEC has almost no control over the MSRB through the threat of removal. *Id.* at 486-87. The President's control over the MSRB is even more attenuated, since SEC Commissioners themselves can be removed only for cause. *See id.*; *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024).

For decades, the MSRB has been the "'primary regulatory authority in the municipal securities market.'" *SEC v. City of Rochester*, 731 F. Supp. 3d 455, 464 (W.D.N.Y. 2024). Under the Exchange Act, "a broker or dealer may not engage in interstate trade in municipal securities unless he registers" with the SEC and the MSRB. *Blount v. SEC*, 61 F.3d 938, 941 (D.C. Cir. 1995) (citing 15 U.S.C. §78o-4(a)(1)); MSRB, *Rule Book* 396-97 (Oct. 1, 2024), perma.cc/D4L4-3FV2 (Rule A-12, *Registration*). Per the

Exchange Act, the MSRB performs three primary functions: rulemaking, enforcement coordination, and de facto taxation.

*First*, the Exchange Act gives the MSRB a broad mandate to "propose and adopt rules to effect the purposes of [the Act] with respect to" every aspect of the municipal securities industry, including trades, advice and guidance, the issuance of municipal securities, and solicitations of municipal entities. 15 U.S.C. §78o-4(b)(2). The MSRB has adopted rules in line with this statutory mandate. For example, broker-dealers must be "qualified" to participate in the industry according to MSRB standards (Rules G-2, G-3, and G-4), must make, keep and preserve certain business records for inspection by other regulatory authorities (Rules G-8 and G-9), and must report information about transactions to the MSRB within a certain time period (Rule G-14, the subject of this petition). *See* MSRB, *Rule Book* 4-24, 28-51, 92-104 (Oct. 1, 2024), perma.cc/D4L4-3FV2.

Under the Exchange Act, an MSRB rule obtains the force of law when either the SEC approves it after notice and comment or, when the MSRB believes certain kinds of rules are urgent, simply when the MSRB files the rule with the SEC. *See generally* 15 U.S.C. §§78o-4(b)(2), 78s(b), 78c(26). In both scenarios, the SEC's only role is to render an up-or-down vote. *Id.* §78s(b)(2) (the SEC must either "approve or disapprove the proposed rule change"). The SEC thus is constrained by the MSRB's policy determinations when reviewing the MSRB's proposed rules.

8

*Second*, the MSRB actively assists FINRA and other regulatory agencies in enforcing violations of the MSRB's rules. *See* 15 U.S.C. §78o-4(b)(4); *id.* §§78o-4(c)(1), 78s(g)(1)(B). The Exchange Act empowers the MSRB to provide "guidance and assistance [to its regulatory partners] in the enforcement of, and examination for, compliance with the rules of the Board." *Id.* §78o-4(b)(4). Accordingly, the "MSRB works cooperatively with … examination and enforcement agencies and maintains frequent and close communication to ensure information sharing so that the MSRB's rules are uniformly enforced and regulatory priorities are communicated to examining officials." MSRB, *Self-Regulation and the Municipal Securities Market* at 14 (Jan. 2018), perma.cc/G8BM-QNB7. The MSRB "provides this coordination and cooperation through the interpretation of MSRB rules, transaction reporting for surveillance, other information sharing, and training support for, and regular calls and periodic meetings with, the staff of the examination and enforcement agencies." *Id.*; *see also* MSRB, *About the MSRB* at 12, perma.cc/DR6P-M5HT (discussing the MSRB's "critical support" to enforcement agencies by, among other things, "provid[ing] reports to enforcement agencies to identify potential rule violations"). This important enforcement role has been formalized in a "memorandum of understanding" between the MSRB and FINRA that "sets out the terms of the relationship." Robert Colby, *Testimony Before the Subcommittee on Capital Markets and Government Sponsored Enterprises Committee on Financial Services*, FINRA (Sept. 22, 2016), perma.cc/9LV9-UF3M; *see also* FINRA Rule 0151, *Coordination with the MSRB*, perma.cc/DMF5-ZQ7L (explaining that the MSRB will

9

"assist in [FINRA's] enforcement actions and examinations"); 15 U.S.C. §78o-4a(a)(2) (directing the SEC's "Office of Municipal Securities" to "coordinate with the [MSRB] for … enforcement actions"). All fines collected for violations of the MSRB's rules must be shared with the MSRB. *See* 15 U.S.C. §78o-4(c)(9) ("Fines collected by the [SEC] for violations of the rules of the Board shall be equally divided between the Commission and the [MSRB]," and SROs like FINRA shall "pay to the [MSRB] 1/3 of all fines collected [for] violations of the rules of the [MSRB]").

*Third*, the MSRB collects tens of millions of dollars each year in fees and fines charged to regulated parties. *See* MSRB, *2024 Annual Report* at 20, perma.cc/MPW9-JDMJ (identifying the sources of nearly $58 million in funding for 2024). A majority of the MSRB's funding comes from underwriting fees, transaction fees, trade count fees, and municipal advisor professional fees, which the MSRB updates each year on an "Annual Rate Card." MSRB, *Understanding the Annual Rate Card*, perma.cc/U6KR-E34B. Because the Exchange Act authorizes the MSRB to charge these fees, *see* 15 U.S.C. §78o-4(b)(2)(J) (regulated entities "shall pay to the Board … reasonable fees and charges"), and requires market participants to register with the MSRB and comply with its rules on pain of violating federal law, *see Blount*, 61 F.3d at 941; 15 U.S.C. §78o-4(a)(1), (c)(1); MSRB, *Rule Book* 396-97 (Oct. 1, 2024), perma.cc/D4L4-3FV2 (Rule A-12, *Registration*), these fees are essentially de-facto taxes, *cf. Consumers' Rsch., Cause Based Comm., Inc. v. FCC*, 88 F.4th 917, 930, 934 (11th Cir. 2023) (Newsom, J., concurring in the judgment).

## C.     The MSRB's Rule Change for Reporting Municipal Securities

Since 2005, the MSRB has required broker-dealers that buy and sell municipal securities to report those trades to the MSRB. App. 8. Broker-dealers do this by filing reports with the MSRB's electronic "Real-Time Transaction Reporting System," or "RTRS." *Id.* The MSRB has long required these trade reports to be filed within 15 minutes. *Id.*; *see also* MSRB, *Rule Book* 92-93 (Oct. 1, 2024), perma.cc/D4L4-3FV2 (Rule G-14, *Reports of Sales or Purchases*). If a broker-dealer reports to RTRS outside the time-limit, the broker-dealer can be subject to an enforcement action, App. 169, and severe penalties, *see* FINRA Rule 8310, perma.cc/XB4C-HZ7P ("FINRA may impose … sanctions … for each violation of … the rules of the [MSRB]."); FINRA, *Sanction Guidelines* at 50 (Mar. 2024), perma.cc/4ZN4-ETYQ (listing penalties including fines ranging from $5,000 to $200,000, "suspension of up to two years," and "expulsion"); *see also* App. 63 ("[E]ach [late] trade could expose members to tens of thousands of dollars of potential liability.").

Most trades are reported in far less time than fifteen minutes. In 2022, for example, "97 percent of trades in the municipal securities market … were reported within five minutes," and "73.7 percent … were reported within one minute." App. 9. The reporting time varies between one and five minutes because of the different ways that trades are executed. Trades that are "reportable within one minute are nearly all executed on electronic platforms and are nearly all reported on an automated basis immediately upon execution." App. 52. By contrast, manual trading involves a broker-

dealer directly participating in the trading process—such as by contacting another broker-dealer via phone or electronic message to execute the trade, or by reviewing and approving the trade to provide an extra layer of quality control or risk management. *See* App. 117-20, 168. Reporting this type of trade to RTRS takes "substantial time." App. 75, 93-94. It is often "impossible" or "prohibitively expensive" to complete this task within one minute. App. 59-60, 64, 110, 116-17, 119-20, 134. Smaller broker-dealer firms, in particular, "cannot feasibly purchase or develop systems to enable faster reporting." App. 162; *see* App. 53, 90-91.

On August 2, 2022, the MSRB announced a proposed rule to, among other things, dramatically shorten the time to report trades in municipal securities—from 15 minutes to one minute. *See* MSRB Regulatory Notice 2022-07, *Request for Comment* (Aug. 2, 2022), perma.cc/7C6C-RGZB. The proposed rule stated that its "main benefit … would be improved transparency in the municipal securities market," which would "reduc[e] … transaction costs" and "theoretically increase investors' negotiating power." *Id.* at 7-10. Like a federal agency, the MSRB solicited comments from the public before finalizing its proposed rule. *Id.* at 1; *see* MSRB, *Rule Book* ix (Oct. 1, 2024), perma.cc/D4L4-3FV2 ("[T]he MSRB generally publishes rulemaking proposals as requests for comment and provides for public comment periods" to "provide the maximum opportunity for industry participation."). Many regulated and other interested parties filed comments opposing the new rule. *See* MSRB Regulatory Notice 2022-07, *Comments*, perma.cc/PKD9-E327.

12

On January 26, 2024, after considering comments on the proposed rule, the MSRB filed an amended version of the rule with the SEC, App. 8, followed by another amended version in July 2024, *see* App. 126. The final proposed rule was largely the same as originally proposed, except that the one-minute rule was pushed back for certain transactions. Broker-dealers with "limited trading activity" (meaning "fewer than 2,500 … transactions" in one of the prior two years) could still report their trades in fifteen minutes. App. 167. And certain "manual" trades would need to be reported in five minutes instead of one minute. App. 167-68. But the manual trade "exception" still represented a significant reduction in reporting time from the prior fifteen-minute rule. The MSRB proposed to phase-in this reduction over three years by requiring broker-dealers to report manual trades within 15 minutes the first year, 10 minutes the second and third years, and 5 minutes thereafter. App. 168-69.

The proposed rule received fierce opposition from the public. *First*, commenters told the SEC that the proposed rule would inflict substantial and disproportionate costs on smaller broker-dealers, causing some to exit the market. App. 69, 76, 79, 82, 90, 93-94. Smaller broker-dealer firms would need to purchase "sophisticated and expensive automated reporting systems" that would cost some of them "at least … half a million dollars more each year." App. 91. Moreover, smaller firms would be unable to report manual trades fast enough to comply. Manual trades, which make up a "significant portion" of small firm trades, often require longer than five minutes to report. App. 61, 69, 93-94. The proposed rule's phase-in of the five-minute timeline

was no solution, as it would "only delay the inevitable reduction or elimination of smaller brokerage firms." App. 156. Thus, even if smaller firms could afford to purchase new technology, they would still be forced out of the market unless they increased their automated trading, which would harm investors by eliminating the human element from trading. App. 75.

*Second*, commenters told the SEC that these disproportionate harms to smaller broker-dealers would significantly burden competition. App. 47, 79, 82, 113, 130. By imposing disproportionate costs on smaller broker-dealer firms, the proposed rule would give larger firms a competitive advantage and force smaller firms out of the market, reducing the number of firms competing in the market. App. 79, 82, 98, 112. The loss of these small firms would reduce the number of "bids and asks on countless issues, particularly smaller, local bonds," App. 82, which would "negatively affect liquidity," App. 112-13. The proposed rule never justified these burdens on competition, such as through evidence that "current reporting requirements are inadequate" or examples of "specific instances of investor harm due to current requirements." App. 72-73; *see* App. 84 (the proposed rule "does not bother to cite a scintilla of statistical or objective support for the need" to reduce reporting times); App. 42 ("The proposed amendment appears to be regulation for regulation's sake with no corresponding benefits.").

*Third*, commenters told the SEC that the reporting exception for broker-dealers with only 2,500 trades was too limited and thus discriminated against smaller broker-

dealers that did not qualify for the exception (because their trades exceeded the low threshold). App. 156; *see also* App. 92 (describing the trades threshold as an "arbitrary" number that must be "significantly expand[ed]" to protect other small broker-dealers). Commenters made clear that this discrimination would provide, at most, only a "'minimal'" benefit to market transparency. App. 140-41.

*Fourth*, commenters told the SEC that the proposed rule did not adequately address the costs and benefits of the change. The proposed rule provided no "research," "empirical evidence," "quantifiable data," or "statistical examples" showing that forcing broker-dealers to report transactions within one minute would provide any tangible economic or transparency benefits. App. 79-82, 91, 155. The proposed rule also failed to consider that broker-dealers wanting to comply would need to pay enormous sums in compliance costs. App. 91. These "prohibitive costs" would force some small firms to exit the market. App. 69, 90-91; *supra* 12-14. In addition, the proposed rule did not "measure any purported benefit against either the cost of removing smaller brokers from the market or the costs for brokers to comply with the revised reporting requirement." App. 155. Commenters warned the SEC that the agency was required to conduct a cost-benefit analysis in its final order. App. 70, 131.

*Finally*, commenters told the SEC that it could not approve the proposed rule because this type of regulatory action needed to come from the government, and not a quasi-private, quasi-public regulatory entity. *See* App.130 (arguing that the SEC should "abandon" the proposed rule "in [its] entirety" because SROs cannot be used as "a

15

conduit to implement rules that lack proper justification and fall outside [the SEC's] statutory authority"); *see also* App. 98 (similar).

## D.    The SEC Order Approving the Proposed Rule

On September 20, 2024, the SEC approved the MSRB's proposed rule. In doing so, the SEC made only cursory, conclusory findings. App. 175-77. Consistent with the Exchange Act, the SEC did not modify or amend the MSRB's proposed rule but simply approved the rule as proposed by the MSRB. *Id.* The SEC's order was severely flawed for several reasons.

*First*, the SEC did not adequately assess, in response to comments, how the MSRB's rule would disproportionately impact smaller broker-dealers. *Id.*; *see also* 5 U.S.C. §604. The SEC recognized that the costs of "complying with a shortened reporting timeframe … could lead some dealers to exit the market, curtail their activities[,] or consolidate with other firms," but the SEC asserted—without explanation or evidence—that the manual trade and limited trading exceptions and the extended phase-in period would "minimize the impact" of the rule. App. 176-77. The SEC also claimed that the exceptions and slower phase-in period "addressed commenters' concerns," App. 177, even though commenters argued that the exceptions and phase-in period were inadequate to mitigate the negative impacts on smaller broker-dealers, *supra* 13-15.

*Second*, the SEC did not adequately explain how the rule's burden on competition was either "necessary or appropriate." 15 U.S.C. §78o-4(b)(2)(C). The SEC recognized

16

that the rule's significant costs would create "competitive and liquidity concerns" and "lead some dealers to exit the market, curtail their activities[,] or consolidate with other firms," but the SEC asserted—again without evidence or analysis—that the exceptions and extended phase-in period would "tak[e] into account" those concerns and "minimize" them. App. 176-77.

*Third*, the SEC did not adequately address concerns that the trading exception was too narrow and thus discriminated against small broker-dealers whose trades exceeded the limited threshold. *Id.* at 175-77; *see* 15 U.S.C. §78o-4(b)(2)(C). The SEC simply asserted that, because the rule "increased transparency while mitigating commenters' concern" through the exceptions and the extended phase-in for manual trades, the rule was "reasonably designed to not permit unfair discrimination between customers, issuers, brokers, or dealers." App. 176.

*Fourth*, the SEC did not adequately address the costs and benefits of the rule. App. 175-77; *see* 15 U.S.C. §78c(f). The SEC never quantified or estimated the costs of the rule, including the disproportionate costs to smaller broker-dealers that did not qualify for the exceptions. Nor did the SEC quantify or estimate the benefits that the proposed rule would create. Instead, the SEC spoke in generalities about the benefits of "transparency": The rule would "brin[g] about greater market transparency," which would "reduc[e] information asymmetries between market participants," "enhanc[e] investor confidence," and "enabl[e] market participants to make more informed decisions." App. 176. The SEC also never properly weighed the costs and benefits of

17

the rule; the SEC merely asserted that the rule "reasonably balance[s] the benefits … of increased transparency while mitigating commenters' concern" about costs. *Id.*

*Finally*, the SEC responded to the argument that these types of rules should be adopted by the government, not a quasi-private, quasi-public agency, by simply claiming that "[t]he Commission did not direct the MSRB to file the proposed rule change and is not using the MSRB as a conduit to enact the proposed rule change." App. 176 n.218.

On November 15, 2024, ASA filed a petition for review with this Court, asking the Court to set aside the Order. Dkt. 1.[1]

## STANDARD OF REVIEW

This Court reviews the Order under Section 25(a) of the Exchange Act, 15 U.S.C. §78y(a), and applies the Administrative Procedure Act, *see Bloomberg LP v. SEC*, 45 F.4th 462, 472 (D.C. Cir. 2022) (citing 5 U.S.C. §706). The Court must "set

---

[1] On September 20, the SEC also approved a one-minute reporting rule for fixed-income securities that was proposed by FINRA, which ASA has also challenged. *See ASA v. SEC*, No. 24-13750 (11th Cir.). On February 5, 2025, FINRA announced that it "will not set an effective date" for the rule and would "work expeditiously [to] develo[p] and fil[e] with the SEC substantive changes" to the rule that address "concerns about implementing shorter reporting requirements." FINRA, *Updating TRACE Reporting Timeframes* (Feb. 5, 2025), perma.cc/BXZ4-LM83. On February 13, 2025, ASA moved to hold that case in abeyance, and the Court granted the motion on February 18. On February 5, the MSRB also issued a notice regarding the amendments challenged by ASA. *See* MSRB, *Delayed Announcement of Effective Date for Amendment to MSRB Rule G-14 to Shorten Timeframe for Reporting Transactions in Municipal Securities* (Feb. 5, 2025), perma.cc/FC86-TTQQ. Unlike FINRA, however, the MSRB said only that it would "*delay* announcing the effective date" of its amendment so that it could "*consider* issues in connection with compliance," such as whether to "undertake any such clarifications, interpretive guidance, or *potential* further amendments." *Id.* (emphasis added).

aside" the Order if it is "contrary to constitutional right, power, [or] privilege," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. §706(2); *NetCoalition v. SEC*, 615 F.3d 525, 532 (D.C. Cir. 2010). A decision is arbitrary and capricious if the SEC did not "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'"; if it "entirely failed to consider an important aspect of the problem"; if it "offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or if it "fail[ed] to respond to relevant and significant public comments," *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014). For an agency action to be supported by "'substantial evidence,'" the SEC must articulate a reasoned explanation for its decision. *State Farm*, 463 U.S. at 44. The SEC must make its own "findings and determinations" and may not "abdicat[e] that responsibility" to the MSRB. *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 443, 446-47 (D.C. Cir. 2017). The Court reviews the SEC's legal conclusions de novo. *Stone & Webster Constr., Inc. v. DOL*, 684 F.3d 1127, 1132 (11th Cir. 2012).

To approve an MSRB rule, the SEC must find that the rule satisfies the Exchange Act's standards, including those set forth in Section 78o-4(b). In particular, the MSRB's rules must be "designed to … promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling,

processing information with respect to, and facilitating transactions in municipal securities, … and, in general, to protect investors, municipal entities, obligated persons, and the public interest"; and they must not "impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter," or "permit unfair discrimination among customers, municipal entities, obligated persons, municipal securities brokers, municipal securities dealers, or municipal advisors." 15 U.S.C. §78o-4(b)(2)(C). The SEC must assess the costs and benefits of a proposed MSRB rule. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); 15 U.S.C. §78c(f).

Under the Exchange Act, a petitioner may seek judicial review on a basis not "urged before the Commission" in the underlying proceeding if there was "reasonable ground" for not doing so. 15 U.S.C. §78y(c)(1). This standard is more forgiving than other statutes authorizing review of agency orders. *Compare id. with, e.g.*, 29 U.S.C. §160(e) (requiring "extraordinary circumstances" to raise new arguments in NLRB enforcement proceedings); *id.* §660(a) (same for Occupational Safety and Health Review Commission orders); 30 U.S.C. §816(a)(1) (same for Mine Safety and Health Review Commission orders). In its comments, ASA argued that the SEC could not approve the proposed rule because this type of regulatory action needed to come from the government, and not a quasi-private, quasi-public regulatory entity. *See* App. 98, 130. This "'general constitutional objectio[n]'" gave the SEC "a chance to address" the argument that the MSRB is improperly structured, which was enough to preserve the

20

argument for review in this Court. *Blount*, 61 F.3d at 940-41; *see, e.g.*, *WildEarth Guardians v. EPA*, 770 F.3d 919, 943 (10th Cir. 2014). Yet this Court could decide ASA's constitutional challenge to the MSRB's structure even if ASA had never raised it because there were "reasonable ground[s]" not to. 15 U.S.C. §78y(c)(1). Because the proceeding below was "ill suited to address structural constitutional challenges … outside the [officials'] areas of technical expertise" it would be "appropriate" for the Court to "entertain constitutional challenges … even [if] those challenges were not raised in administrative proceedings." *Carr v. Saul*, 593 U.S. 83, 92-93 (2021); *see also id.* (discussing the "futility exception" for constitutional challenges). The remaining arguments that ASA makes were plainly raised before the SEC. *Supra* 13-15.

## SUMMARY OF ARGUMENT

The Municipal Securities Rulemaking Board is a one-of-a-kind regulatory entity that flouts our entire constitutional structure. Like other federal agencies, it is charged with regulating an entire industry of activities. The MSRB writes the rules; it issues interpretations of its rules; it helps enforce violations of the rules; it collects fines when those rules are broken; and it charges mandatory fees to every entity and individual whom it regulates. Yet the MSRB lacks the constitutional safeguards the Founders put in place for entities exercising this type of regulatory power. Although explicitly created by Congress, it is nominally a private, nonprofit corporation. Neither the President nor the SEC appoints MSRB Directors—the MSRB is self-perpetuating, as the Directors pick their own leaders at the end of their terms. And MSRB Directors are not

21

answerable to any official with democratic accountability. An MSRB Director can be removed by the SEC—not the President—and only for serious misconduct after a formal hearing, whose outcome can be appealed. The few wisps of governmental control available, such as the SEC's ability to approve or disapprove an MSRB rule, are woefully inadequate to hold the MSRB accountable.

This unicorn regulatory body—one that has no comparison anywhere in our federal system—runs afoul of the Constitution in several ways. The MSRB violates the private nondelegation doctrine because it is exercising delegated legislative and executive power without being subordinate to the SEC or subject to the SEC's authority or surveillance. The MSRB violates Article II because it is exercising significant executive power, and the President does not have adequate control over MSRB Directors. And the MSRB violates the Appointments Clause because its Directors are "Officers of the United States" who were not properly appointed. The SEC's order approving the rules of this unconstitutional entity must be set aside. *See* 5 U.S.C. §706(2).

Constitutional problems aside, the Order is riddled with errors. The MSRB's new rules impose massive costs on regulated entities, including smaller broker-dealers, without any evidence that the rules were needed or would provide any measurable benefit whatsoever. Yet the SEC rubber-stamped the changes. The Order fails to adequately assess the rule's costs and benefits. It fails to adequately assess how the rule discriminates among broker-dealers. It fails to adequately assess how the rule imposes

22

unnecessary and inappropriate burdens on competition. And it fails to adequately assess how the rule disproportionately harms small entities.

Both the MSRB's unconstitutional structure and the Order's numerous statutory deficiencies are serious legal errors warranting vacatur. This Court should set aside the Order.

## ARGUMENT

I.   **The Order must be set aside because the MSRB is unconstitutionally structured.**

The MSRB is unconstitutionally structured for three reasons. First, the MSRB violates the private nondelegation doctrine because it is a nominally private corporation that exercises legislative and executive powers without adequate governmental supervision. Second, the MSRB violates Article II because it wields significant executive power and the President has insufficient power to control MSRB Directors through appointment and removal. Third, the MSRB's Directors are Officers of the United States who were appointed in violation of the Appointments Clause.

**A.** The Constitution vests "[a]ll legislative powers herein granted" "in a Congress of the United States." Art. I, §1. The Constitution also vests "[t]he executive Power … in a President of the United States." Art. II, §1, cl.1. Accompanying these assignments of power "is a bar on [their] further delegation." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). If one branch could delegate its powers to another, this delegation would threaten "the integrity and maintenance of the system of government ordained by the Constitution." *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989). The

23

Supreme Court has held that Congress may, in certain circumstances, "obtain the assistance of its coordinate Branches" when it lays down an "intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy*, 588 U.S. at 135 (plurality op.) (cleaned up).

"When it comes to private entities, however, there is not even a fig leaf of constitutional justification." *Amtrak*, 575 U.S. at 62 (Alito, J., concurring). "Private entities are not vested with 'legislative Powers.'" *Id.* "Nor are they vested with the 'executive Power,' … which belongs to the President." *Id.* "If people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." *Consumers' Rsch.*, 88 F.4th at 925 (cleaned up) (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022)). "This commonsense principle has come to be known as the private non-delegation doctrine." *Id.* (quotation marks omitted).

Under this Court's precedent, the private nondelegation doctrine is violated when (1) the entity does not "functio[n] subordinately to [an] agency" or (2) the agency does not "retai[n] authority and surveillance over the [entity's] activities." *Id.* at 926 (cleaned up). Here, the MSRB—a nominally private, nonprofit corporation—satisfies neither requirement.

First, the MSRB does not function subordinately to the SEC. Instead, the MSRB is the "'primary regulatory authority in the municipal securities market.'" *City of Rochester*, 731 F. Supp. 3d at 464. Per the Exchange Act, the MSRB "'propos[es] and adopt[s]

24

rules to effect the purposes of [the Exchange Act] with respect to" every aspect of the municipal securities industry. 15 U.S.C. §78o-4(b)(2); *see Blount*, 61 F.3d at 941. The MSRB's rules thus govern every detail of municipal securities trading, including professional qualifications and continuing education, supervision of municipal securities activities, pricing and commissions, mandatory reporting and disclosure, recordkeeping and preservation, conflict-of-interest rules, and other standards of conduct for broker-dealers and advisors. *See* MSRB, *The Role and Jurisdiction of the MSRB*, perma.cc/ZZC6-TYFW; MSRB, *Rule Book* 4-24, 28-51, 92-104 (Oct. 1, 2024), perma.cc/D4L4-3FV2.

As the Order here demonstrates, the MSRB develops its proposed rules on its own. The SEC, in turn, is nothing but a rubber stamp. By statute, all the SEC can do is approve or disapprove the proposed rule. *See* 15 U.S.C. §78s(b)(2); *see id.* §78c(26). Indeed, that is exactly what happened with the MSRB's proposed rule here. Some MSRB rules also take effect immediately without any approval from the SEC. *See* 15 U.S.C. §78s(b)(3)(A). The MSRB thus is nothing like the Universal Services Administrative Company in *Consumers' Research*, which performed merely "'ministerial functions.'" *Consumers' Rsch.*, 88 F.4th at 926.

Second, the SEC does not "retain authority and surveillance over the [MSRB's] activities." *Id.* (cleaned up). MSRB Directors are selected "without any involvement by the SEC or any other government agency." Brodsky, *Unexamined Issues*, 8 Am. Univ. Bus. L. Rev. at 35; *see* 15 U.S.C. §78o-4(b)(1). This lack of appointment power again

distinguishes the MSRB from the Universal Services Administrative Company, where the FCC "sets requirements for selection and selects each of the USAC's nineteen directors" and the FCC Chairman "must approve or appoint" USAC's CEO. *Consumers' Rsch.*, 88 F.4th at 928.

This lack of control continues even after MSRB Directors are appointed, prohibiting the SEC from "maintain[ing] deep and meaningful control over the [MSRB] … as an entity." *Id.* Unlike other SROs, the MSRB has little to fear from the SEC, which cannot deregister the MSRB or otherwise directly intervene to limit its operations. *See* 15 U.S.C. §78s(h)(1) (permitting the SEC to "suspend" or "revoke" other SROs' registrations and to "impose limitations upon [their] activities, functions, and operations"); *see id.* §78c(26). The SEC can remove MSRB Directors only after a determination, on the record after notice and opportunity for hearing, that the Director has willfully violated the Exchange Act, the SEC's rules, or the MSRB's rules or otherwise abused his authority. *Id.* §78o-4(c)(8). And because such decisions are immediately reviewable, the SEC does not even "have the final word on the propriety of its own removal orders." *Free Enter. Fund*, 561 U.S. at 502 (citing 15 U.S.C. §78y(a)(1)). This incredibly high standard for removal effectively strips the SEC (and especially the President) of all control over the MSRB.

The MSRB's freedom to spend the de-facto taxes it collects from regulated parties further demonstrates the SEC's lack of authority and surveillance over the MSRB's activities. The MSRB spends tens of millions of dollars every year, ostensibly

26

to implement the Exchange Act, on a host of initiatives with no oversight from the SEC or the President. *See, e.g.*, MSRB, *Fiscal Year 2025 Budget* at 8-9, perma.cc/8YVM-VG3X (allocating $12.6 million to "develo[p], buil[d] and maintai[n] mission-driven market transparency and regulatory products"); *see also* MSRB, *Strategic Plan: Fiscal Years 2022-2025* at 7 (2021), perma.cc/6U9D-CPG4 (discussing the MSRB's "duty to uphold the public interest and the integrity of this market through a commitment to social responsibility, diversity, equity and inclusion"). The Exchange Act empowers the MSRB to collect these funds yet provides no mechanism for the SEC to oversee these expenditures. 15 U.S.C. §78o-4(b)(2)(J). The MSRB's financial independence also encourages it to spend lavishly on high-ranking officials—dwarfing the salaries of government officials at the SEC. *See* Andrew Ackerman & Heather Gillers, *One of the Most Lucrative Regulatory Jobs in Washington Is Now Open*, Wall St. J. (Aug. 13, 2019), bit.ly/4hUdHwb ("One of the highest-paying jobs in public service just became available: … The job leading the [MSRB] currently pays more than $1 million," which is "roughly six times the salary of the chairman of the [SEC]"). In sum, the MSRB violates the private nondelegation doctrine because it is a nominally private corporation that is neither subordinate to the SEC nor subject to meaningful authority and surveillance. *Consumers' Rsch.*, 88 F.4th at 926.

**B.** The MSRB also violates Article II because it is a nominally private corporation that exercises significant executive power. *See Consumers' Rsch.*, 88 F.4th at 935 (Newsom, J., concurring in the judgment) ("From [Article II's] explicit vesting, it

27

follows that the 'executive Power' can't be exercised by private parties."); *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1338 (D.C. Cir. 2024) (Walker, J., concurring in the judgment in part) ("Article II of the Constitution begins, 'The executive Power shall be vested in a President of the United States of America.' That means private citizens cannot wield significant executive authority."). In addition to proposing and adopting rules (some of which take effect instantly without SEC approval), the MSRB engages in a host of other significant executive functions. That includes, among other things:

- Coordinating and cooperating with examination and enforcement entities, including FINRA, to prosecute violations of the MSRB's rules;

- Issuing interpretations of the MSRB's rules for enforcement entities;

- Reporting transactions in municipal securities for surveillance purposes;

- Sharing information with enforcement entities; and

- Collecting fees and fines (de facto taxes) to carry out the purposes of the Exchange Act.

*Supra* 7-10. Because the MSRB is a nominally private entity that exercises significant executive power, it violates Article II and the separation of powers. *Consumers' Rsch.*, 88 F.4th at 935 (Newsom, J., concurring in the judgment); *Alpine Secs.*, 121 F.4th at 1338 (Walker, J., concurring in the judgment in part).

Even if the "delegation of executive power to a private entity outside the government [were] permissible[,] … it is permissible *only* if that entity 'is adequately subject to Presidential control.'" *Consumers' Rsch.*, 88 F.4th at 937 (Newsom, J., concurring in the judgment) (quoting *Amtrak*, 575 U.S. at 91 (Thomas, J., concurring in

28

the judgment)). But the MSRB exercises its powers without adequate oversight from either the President or the SEC. As explained above, the SEC does not maintain "deep and meaningful control over" the MSRB. *Consumers' Rsch.*, 88 F.4th at 928; *see also infra* 30-32, 36. Nor could it, given the Exchange Act's statutory restraints on SEC influence over the MSRB, including the appointment and removal of MSRB Directors. If anything, the standard for agency supervision and control over a private entity exercising significant executive power is stricter than when the entity performs merely "ministerial functions." *Consumers' Rsch.*, 88 F.4th at 926.

Moreover, "the key isn't the degree of the [SEC's] control, but the *President's*." *Id.* at 937 (Newsom, J., concurring in the judgment). And in that connection, "the Supreme Court's decisions 'treat appointment and removal powers as the primary devices of executive control.'" *Id.* (quoting *Amtrak*, 575 U.S. at 91 (Thomas, J., concurring in the judgment)); *see Trump v. United States*, 603 U.S. 593, 607-09 (2024) (the President's core Article II power includes appointing Officers of the United States and the "'power to remove—and thus supervise—those who wield executive power on his behalf'"). Here, the MSRB's structure provides nothing like the "sort of control that Article II demands." *Consumers' Rsch.*, 88 F.4th at 937 (Newsom, J., concurring in the judgment). MSRB Directors are appointed "without any involvement by the SEC or any other government agency." Brodsky, *Unexamined Issues*, 8 Am. Univ. Bus. L. Rev. at 35. Instead, current Directors nominate and elect future Directors. *See* MSRB, *Rule Book* 391-93 (Oct. 1, 2024) (Rule A-3), perma.cc/D4L4-3FV2. The SEC also cannot remove

a MSRB Director unless it determines (in a formal adjudication subject to judicial review) that the Director has willfully violated federal securities law or abused his authority. 15 U.S.C. §78o-4(c)(8). And the President, in turn, can remove an SEC Commissioner only for cause. *Free Enter. Fund*, 561 U.S. at 487.

*Free Enterprise Fund* is directly on point. There, the Supreme Court reviewed the constitutionality of the Public Company Accounting Oversight Board. The Accounting Board, like the MSRB, was created by Congress as a "private 'nonprofit corporation'" and was given "expansive powers to govern an entire industry," (namely, accounting of public companies). *Id.* at 484-85. Like the MSRB, the Board could "recruit its members and employees from the private sector by paying salaries far above the standard Government pay scale." *Id.* at 484-85; *see, e.g.*, MSRB, *Form 990* at 7-8 (2023), perma.cc/H9JS-RMN5 (identifying 17 MSRB employees making over $250,000 a year). And like broker-dealers with the MSRB, every accounting firm wishing to do business was required to "register with the Board, pay it an annual fee, and comply with its rules and oversight." *Free Enter. Fund*, 561 U.S. at 485; MSRB, *Rule Book* 396-97 (Oct. 1, 2024) (Rule A-12), perma.cc/D4L4-3FV2.

Most problematic was the lack of Executive oversight of the Accounting Board's members. Although the Exchange Act "place[d] the Board under the SEC's oversight," the "individual members of the Board—like the officers and directors of the self-regulatory organizations—[were] substantially insulated from the [SEC's] control." *Id.* at 486. Similar to its power over MSRB Directors, the SEC could not "remove Board

members at will, but only 'for good cause shown,' 'in accordance with' certain procedures," *i.e.*, a formal hearing that itself was subject to judicial review. *Id.* Further insulating the Board members from Presidential control was that SEC Commissioners "cannot themselves be removed by the President except under the *Humphrey's Executor* standard of 'inefficiency, neglect of duty, or malfeasance in office.'" *Id.* at 487.

Taken together, the Accounting Board's structure was found unconstitutional. The Supreme Court held that "the dual for-cause limitations on the removal of Board members contravene[d] the Constitution's separation of powers." *Id.* at 492. The problem was not only that Board Members were "protect[ed] … from removal except for good cause," but the President had no power to make "any decision on whether that good cause exists." *Id.* at 495. That decision was "vested instead in other tenured officers—the Commissioners—none of whom is subject to the President's direct control." *Id.* The result was "a Board that is not accountable to the President, and a President who is not responsible for the Board." *Id.* By "safely encas[ing] [the Board's members] within a Matryoshka doll of tenure protections," the Board's members had unconstitutionally become "immune from Presidential oversight, even as they exercised power in the people's name." *Id.* at 497. Neither the President nor any officer answerable to him was therefore able to fully control the Accounting Board, and the President's "ability to execute the laws—by holding his subordinates accountable for their conduct—[was] impaired." *Id.* at 496.

The MSRB suffers from identical flaws. The SEC can remove the MSRB Directors only for willful violations of the Exchange Act, MSRB rules, or abuses of authority—a removal standard even stricter than for the Accounting Board. And the SEC can satisfy that standard only through a full evidentiary hearing, the outcome of which is also subject to judicial review. SEC Commissioners, in turn, have for-cause removal protections. The MSRB is thus free from Presidential control just as the Accounting Board was. Because the President has no "ability to ensure that the laws [implemented by the MSRB] are faithfully executed," the MSRB's structure is "incompatible with the Constitution's separation of powers." *Id.* at 498.[2]

**C.** If the Court concludes that there is no private nondelegation problem, then that must be because the MSRB is "'part of the Government,'" *Alpine Secs.*, 121 F.4th at 1346 (Walker, J. concurring in the judgment in part) (quoting *Amtrak*, 575 U.S. at 88 (Thomas, J., concurring in the judgment)), or its Directors are functioning as Officers of the United States, *id.* at 1346-47; *Buckley v. Valeo*, 424 U.S. 1, 137-41 (1976). Indeed, at least one court has dismissed the "questionable assertion that [the MSRB] is a purely private organization," since the MSRB was "created by an act of Congress and directed by Congress to 'propose and adopt rules to effect the purposes of [the Exchange Act]'

---

[2] Indeed, this case presents even a third layer of insulation because the SEC delegated its authority to approve the MSRB's rules to the Director of the SEC's Office of Municipal Securities. *See* App. 177; 17 C.F.R. §200.30-3a(a)(2). This delegation further "heightens the concern that [power] may slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499.

within specified constraints." *Blount*, 61 F.3d at 941 (holding that MSRB rules are subject to First Amendment scrutiny); *cf. Scottsdale Cap. Advisors Corp. v. FINRA*, 678 F. Supp. 3d 88, 103 (D.D.C. 2023), *rev'd in part on other grounds*, 121 F.4th 1314 (concluding that FINRA is a "private organization" because "neither an act of Congress nor the SEC created FINRA," whereas "the Municipal Securities Rulemaking Board was a state actor because, *inter alia*, it was 'created by an act of Congress'" (quoting *Blount*, 61 F.3d at 941)).

But while "[c]lassifying [the MSRB] as a public agency might solve its private nondelegation problem," this classification would "ru[n] headlong into the rest of the Constitution." *Alpine Secs.*, 121 F.4th at 1346 (Walker, J. concurring in the judgment in part). That is because MSRB Directors are "Officers of the United States" who were not properly appointed under the Appointments Clause.

Under the Constitution, the President is "responsible for the actions of the Executive Branch and cannot delegate that ultimate responsibility or the active obligation to supervise that goes with it." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (cleaned up). "The Framers recognized, of course, that no single person could fulfill that responsibility alone, and expected that the President would rely on subordinate officers for assistance." *Id.* (cleaned up). Today, "thousands of officers wield executive power on behalf of the President in the name of the United States." *Id.* These officers "acquir[e] [their] legitimacy and accountability to the public through a

33

clear and effective chain of command down from the President, on whom all the people vote." *Id.* (cleaned up).

This accountability occurs through compliance with the Appointments Clause, which provides:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, §2, cl.2. Assigning the nomination power to the President "guarantees accountability for the appointees' actions because the 'blame of a bad nomination would fall upon the president singly and absolutely.'" *Arthrex*, 594 U.S. at 12 (quoting The Federalist No. 77, at 517 (A. Hamilton) (J. Cooke ed. 1961)). The Appointments Clause also "adds a degree of accountability in the Senate, which shares in the public blame 'for both the making of a bad appointment and the rejection of a good one.'" *Id.*

As the Clause makes clear, "[o]nly the President, with the advice and consent of the Senate, can appoint noninferior officers, called 'principal' officers as shorthand." *Id.* The Appointments Clause also permits Congress to "dispense with joint appointment, but only for inferior officers." *Id.* "Congress may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* at 12-13. Here, there is no dispute that MSRB Directors were neither nominated by the

President and confirmed by the Senate nor appointed by the President, a Court of Law, or the Head of a Department. *Supra* 6-7. Thus, the key question is whether MSRB's Directors are "officers" of the United States, rather than whether they are "principal" or "inferior" officers. *See, e.g.*, *Lucia v. SEC*, 585 U.S. 237, 244-45 & n.3 (2018) ("The sole question here is whether the Commission's ALS are 'Officers of the United States.'"). MSRB's Directors plainly qualify as "Officers."

The Appointments Clause "prescribes the exclusive means of appointing 'Officers.'" *Id.* at 244 (citing U.S. Const. art. II, §2, cl.2). The Supreme Court has articulated a two-element test for determining whether an individual is an officer: (1) whether the individual's duties are "'continuing and permanent,'" rather than "'occasional or temporary,'" *id.* at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1878)); and (2) whether the individual "'exercis[es] significant authority pursuant to the laws of the United States,'" *id.* (quoting *Buckley*, 424 U.S. at 126). MSRB Directors satisfy both elements.

First, MSRB Directors occupy positions that are "'continuing and permanent,'" rather than "'occasional or temporary.'" *Id.* Board members serve multi-year terms in official positions established by the SEC under an Act of Congress. *See* 15 U.S.C. §78o-4(b)(1). And the position of MSRB Director does not "depend on the identity of the person occupying it." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022). Rather, MSRB's statutory duties "'continue, though the persons [making up its board]

35

be changed.'" *Id.* (quoting *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.)).

Second, MSRB Directors "'exercis[e] significant authority pursuant to the laws of the United States.'" *Lucia*, 585 U.S. at 245. As explained, the MSRB is the "'primary regulatory authority in the municipal securities market.'" *City of Rochester*, 731 F. Supp. 3d at 464. It proposes and adopts rules to implement the Exchange Act, interprets its rules after they take effect, coordinates with FINRA and the SEC to enforce violations of its rules, and collects de facto taxes that are authorized by Congress. By promulgating "government-enforced condition[s] to any participation in a municipal securities career," the MSRB exercises significant authority "of the purest sort." *Blount*, 61 F.3d at 941.

If MSRB Directors are Officers of the United States, there is no question that they are improperly appointed. After the SEC appointed MSRB's initial board in 1975, MSRB's Directors have nominated and elected their successors ever since. *See* Pub. L. No. 94-29, §13; 15 U.S.C. §78o-4(b)(1). Such a statutory structure violates the Appointments Clause on its face.

*        *        *

"If people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion." *Consumers' Rsch.*, 88 F.4th at 925 (cleaned up). To justify its existence, the MSRB will likely rely on a "Goldilocks defense." *Alpine Secs.*, 121 F.4th at 1351 (Walker, J., concurring in the

judgment in part). MSRB will argue that it is "too much like a private entity for Article II's strictures, yet too much like the government for the private nondelegation doctrine to apply." *Id.* But MSRB "'cannot have its cake and eat it too.'" *Id.* Whether deemed a private entity, a public entity, or something in between, the MSRB's "split identity fails to provide the accountability required by our Constitution." *Id.* The SEC's order approving the rules of this unconstitutional entity must be set aside. *See* 5 U.S.C. §706(2).

## II.    The SEC failed to adequately assess the costs and benefits.

The SEC must perform a cost-benefit analysis when reviewing a proposed SRO rule change. 15 U.S.C. §78c(f) (SRO rules must "promote efficiency, competition, and capital formation"); *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (APA requires agencies to "conside[r] the costs and benefits associated with the regulation" (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)). The SEC's "failure to 'apprise itself—and hence the public and the Congress—of the economic consequences of a proposed [SRO rule]' makes promulgation of the rule arbitrary and capricious and not in accordance with law." *Bus. Roundtable*, 647 F.3d at 1148.

The SEC cannot satisfy its cost-benefit obligations through an abstract, purely qualitative discussions of costs and benefits. *Id.* at 1149. Before it can weigh the costs and benefits, the SEC must first "adequately … quantify" the costs and benefits of an SRO's proposed rule. *Id.* If the SEC has "uncertainty" about the numerical value of the costs and benefits, it must "'exercise its expertise to make tough choices about which

of the competing estimates is most plausible, and … hazard a guess as to which is correct, even if the estimate will be imprecise.'" *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (cleaned up). If an estimate is impossible, the SEC must still "determine" a numerical "range" of costs and benefits. *Id.* And an estimate or range must have a "basis" in "evidence" and not be "mere speculation." *Bus. Roundtable*, 647 F.3d at 1150. "[U]ncertainty … does not excuse the Commission from its statutory obligation to do what it can to apprise itself—and hence the public and the Congress— of the economic consequences of a proposed regulation before it decides whether to adopt [it]." *Chamber of Com.*, 412 F.3d at 144. If the SEC is unable to quantify even a non-speculative estimate or range, it must "explain why." *Bus. Roundtable*, 647 F.3d at 1149. The SEC must make its own "findings and determinations" and may not "abdicat[e] that responsibility" to an SRO. *Susquehanna Int'l Grp., LLP*, 866 F.3d at 443, 446-47.

After the SEC has performed this substantive economic analysis, it must properly "weig[h] the rule's costs and benefits." *Bus. Roundtable*, 647 F.3d at 1153; *cf. Michigan*, 576 U.S. at 750; *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004). The SEC may not "inconsistently and opportunistically fram[e] the costs and benefits" by downplaying or discounting costs, over-emphasizing potential benefits, or inaccurately weighing costs and benefits. *Bus. Roundtable*, 647 F.3d at 1148-49, 1151, 1153-56. Any purported benefits of an SRO rule must be "substantiate[d]"; any conclusion that the rule will produce "net benefit[s]" must be

accurate and based on every relevant factor; and the possibility that "the rule will be of no net benefit" must be "adequately address[ed]." *Id.* at 1149, 1153, 1155.

Here, the SEC never even tried to satisfy these requirements. Commenters repeatedly told the SEC that the MSRB's proposal did not adequately quantify costs and benefits or engage in a substantive cost-benefit analysis. *Supra* 15; *see, e.g.*, App. 155-56 (noting the "failure to conduct a fulsome cost assessment" or to "measure any purported benefit against either the cost of removing smaller brokers from the market or the costs for brokers to comply with the revised reporting requirement"). And commenters warned the SEC that its failure to do a cost-benefit analysis would violate the law. *Supra* 15; *see, e.g.*, App. 131 ("[T]he SEC's reluctance to conduct a robust economic cost-benefit analysis … expos[es] [the SEC] to potential legal challenges."). But the SEC ignored these warnings.

The SEC recognized that the Order imposed steep compliance costs—so steep that they "could lead some dealers to exit the market, curtail their activities[,] or consolidate with other firms." App. 176. But its analysis ended there. The SEC never quantified these costs, App. 175-77; *see Bus. Roundtable*, 647 F.3d at 1149, or even provided a cost "estimate" or "range," *Chamber of Com.*, 412 F.3d at 143; *see* App. 175-77. The SEC never explained why costs could not be quantified or estimated. *Bus. Roundtable*, 647 F.3d at 1149; *see* App. 175-77. And the SEC never quantified the benefits of the rule. *See* App. 175-77. So the SEC had no idea how much monetary value, if any, would be generated as a positive benefit from the Order. App. 175-77.

Despite never quantifying the rule's costs and benefits, the SEC declared that the rule "reasonably balance[s] the benefits to market participants of increased transparency while mitigating commenters' concern of a shortened trade reporting deadline." App. 176. This assertion is "mere speculation." *Bus. Roundtable*, 647 F.3d at 1150. And it does not "'cogently explain'" why the SEC decided that the relative costs and benefits made it reasonable to "'draw [a] lin[e]'" at one minute for regular trades, five minutes for certain manual trades, and fifteen minutes for limited trading activity. *Prairie Band Potawatomi Nation v. Yellen*, 63 F.4th 42, 46 (D.C. Cir. 2023). If improving transparency "perfect[s] the mechanism of a free and open market in municipal securities," App. 176, why didn't the SEC maximize transparency by requiring even faster reporting—in 30 seconds or even 15 seconds? Conversely, if the compliance costs were substantial and needed to be mitigated, why didn't the SEC do more to mitigate them by adopting broader exceptions or a more modest reporting rule—such as a 10-minute rule? Did the SEC know the relative costs and benefits of a one-minute rule compared to a 30-second or ten-minute rule? Did the SEC calibrate its exceptions to maximize the benefits of transparency relative to the costs? Did the SEC determine that the benefits of increased transparency were too small relative to costs for manual trades or limited trading activity? The SEC never answered these or any other questions about costs and benefits. Indeed, it gave no indication that it ever "adequately … assess[ed]" any of the "economic effects of [the] new rule." *Bus. Roundtable*, 647 F.3d at 1148.

The SEC claimed that the rule "reasonably balance[s]" the costs and benefits. App. 176. But that assertion "opportunistically frame[s] the costs and benefits." *Bus. Roundtable*, 647 F.3d at 1148-49. The SEC arbitrarily discounted significant costs that will drive some broker-dealers out of the market, such as forcing broker-dealers to spend half-a-million dollars in yearly compliance costs and transition away from manual trading toward automated trading. *Supra* 13-14. The SEC dismissed these costs and their effect on the market, claiming that they were "addressed" by the five-minute reporting window for manual trades and the limited trading exception, which protected only some small broker-dealer firms. App. 177. Brushing aside the costs, the SEC emphasized the importance of marginal reductions in reporting times (from five minutes to one minute) for the nebulous benefits of "increasing market transparency and providing the market with more efficient pricing information." App. 176. But "the uncontroverted record shows that the regulation gives no meaningful benefit, let alone alleviates some great danger." *Mexican Gulf Fishing*, 60 F.4th at 966.

Thus, the Order's weighing of costs and benefits is *ipse dixit*. It is not based on "the evidence before the [SEC]"—much less supported by substantial evidence, 5 U.S.C. §706(2)(E)—and it cannot be "ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The SEC's approval of the Order, while inexplicably refusing to "apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation before it decides whether to adopt the measure," *Chamber of Com.*, 412 F.3d at 144, violates the Exchange Act and the APA,

41

*see* 5 U.S.C. §706(2)(A), (C), (E); *Bus. Roundtable*, 647 F.3d at 1148; *NetCoalition*, 615 F.3d at 532-33.

## III. The SEC failed to adequately assess whether the one-minute rule permits unfair discrimination between broker-dealers.

The Order is also unlawful because it discriminates against certain small broker-dealers without adequately explaining why that discrimination is not "unfair." 15 U.S.C. §78o-4(b)(2)(C). There are "numerous requirements the SEC must consider when reviewing a[n] [MSRB] rule change," and failure to adequately assess those factors is arbitrary and capricious. *Bloomberg*, 45 F.4th at 466, 469. Among other factors, "[t]he rules of the [MSRB], [at] a minimum, shall … [not] permit unfair discrimination among customers, municipal entities, obligated persons, municipal securities brokers, municipal securities dealers, or municipal advisors." 15 U.S.C. §78o-4(b)(2)(C). The SEC's explanation must be supported by substantial evidence. *NetCoalition*, 615 F.3d at 533.

Here, the Order treats some small broker-dealer firms differently than others by creating an overly narrow trading exception that only protects a handful of firms. Commenters warned the SEC that the limited-trading exception was too narrow and didn't adequately protect smaller broker-dealers. *See, e.g.*, App. 154 ("Given the limits of said exceptions, smaller broker-dealers like us risk being driven out of the fixed-income markets due to prohibitive costs."); App. 131 ("The proposa[l] … pose[s] a significant threat to the participation of small and midsized broker-dealers in fixed income

markets."). And the SEC recognized that the one-minute rule imposes costs that would cause broker-dealers that did not qualify for the exception to "exit the market, curtail their activities[,] or consolidate with other firms." App. 176.

Yet the Order disregarded these concerns. The new rule sets the limited trading exception at 2,500 trades over two calendar years, protecting only 476 broker-dealers, who account for "'1.4 percent of total trades and 2.3 percent of the total par value traded.'" App. 174. All other smaller firms must comply with the one-minute rule and either pay disproportionate costs or exit the market. App. 176-77; *see also* App. 154-55; *supra* 13-15.

The SEC's only reason for discriminating against these small firms is that the rule "increase[s] transparency." App. 176. But that doesn't explain why some small broker-dealers must be forced to comply and not others. App. 176. It also doesn't explain why this discrimination is "fair." 15 U.S.C. §78o-4(b)(2)(C). The SEC asserts that the Order "balance[s] the benefits … of increased transparency" with "commenters' concern of a shortened trade reporting deadline." App. 176. But commenters argued that the SEC could pursue the goal of transparency and avoid discriminating between small firms by expanding the limited-trading exception to protect more firms. *See* App. 91-92 (the limited trading exception's "threshold is far too low" and should be "significantly expand[ed]"); App. 156 (same). The SEC never adequately explained why the MSRB's threshold was acceptable. App. 175-77. The SEC thus drew a discriminatory line that is unexplained and unexplainable. It is arbitrary and capricious, contrary to statute, and

43

unsupported by substantial evidence. *See* 5 U.S.C. §706(2)(A), (C), (E); *Bloomberg*, 45 F.4th at 466, 469.

## IV. The SEC failed to adequately assess whether the Order imposes unnecessary or inappropriate burdens on competition.

The SEC also failed to show that the Order's "burden on competition" is "necessary or appropriate," as required by the Exchange Act. 15 U.S.C. §78o-4(b)(2)(C). The SEC may not approve an MSRB rule change if it "impose[s] any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." *Id.* If the SEC fails to adequately consider whether a burden is "necessary or appropriate," its order is arbitrary and capricious. *See Bloomberg*, 45 F.4th at 466, 469. And the SEC's determination must be supported by substantial evidence. *Id.* at 475; *NetCoalition*, 615 F.3d at 533.

This provision means that the SEC cannot pursue the Act's purposes at all costs. 15 U.S.C. §78o-4(b)(2)(C); *see Am. Petrol. Inst. v. SEC*, 953 F. Supp. 2d 5, 21-23 (D.D.C. 2013) (imposing "billions of dollars" in costs, when the SEC could have granted a limited exemption to avoid that burden on competition, was not "necessary or appropriate"); *Michigan*, 576 U.S. at 752 (a rule is not "appropriate" if it "does significantly more harm than good"); *Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 359 (D.C. Cir. 2003) (a "necessary or appropriate" action does not seek to obtain "benefits to any degree"). Burdens on competition are "necessary," 15 U.S.C. §78o-4(b)(2)(C), when they are "'essential'" or "'needed for some purpose or reason.'"

*Campbell v. Universal City Dev. Partners, Ltd.*, 72 F.4th 1245, 1255 (11th Cir. 2023). And

burdens on competition are "appropriate," 15 U.S.C. §78o-4(b)(2)(C), when they are

"'specially suitable,'" "'fit[ting],'" or "'proper,'" *Sossamon v. Texas*, 563 U.S. 277, 286

(2011). In short, "standards that are 'necessary or appropriate' … are those that are

needed … or suit[able]." *Allstates Refractory Contractors, LLC v. Su*, 79 F.4th 755, 765 (6th

Cir. 2023).

    The Order violates the SEC's obligations by pursuing the goal of "transparency"

at all costs. *See, e.g.*, *Am. Petrol. Inst.*, 953 F. Supp. 2d at 21-23. The Order acknowledged

that the costs associated with complying with the new rule will force some firms to exit

the market. *See* App. 176-77. The SEC claimed that these burdens are "necessary or

appropriate" because the Order adopts exceptions for manual trades and limited trading

activity. App. 176-77. But as the SEC seemed to acknowledge, these exceptions do not

eliminate the burden on competition or provide any help for broker-dealers that cannot

invoke the exceptions. App. 176-77. The SEC never explained why those remaining

burdens are "necessary or appropriate." App. 176-77. Nor did the SEC explain why

partly mitigating the Order's burden on competition makes the remaining burden

"needed" or "suitable" to accomplish the Act's purposes. *Campbell*, 72 F.4th at 1255;

*Sossamon*, 563 U.S. at 286. This lack of explanation is especially troubling here, where

the SEC has not quantified the Order's costs or benefits, making the extent of the

Order's burden "uncertain." *Bloomberg*, 45 F.4th at 475. In such cases, the SEC should

provide "significant evidence," not mere assertions, that the burden is "necessary or

appropriate." *Id.* At a minimum, the SEC must provide "substantial evidence." *NetCoalition*, 615 F.3d at 533.

The Order instead provides no evidence. Other than vaguely referencing goals of "transparency," the Order never explains "why current reporting requirements are inadequate or how investors would benefit by a shift to a mandated one-minute time frame." App. 72; *see* App. 176-77. Nor does it "offer any empirical evidence or past research that would support a one-minute requirement" or "identif[y] any specific instances of investor harm due to current requirements." App. 73; *see* App. 176-77. All the evidence before the SEC showed that, for smaller firms, "five minutes is typically the fastest time on average for trades to be reported." App. 73. The SEC's only reason for imposing burdens on competition through a one-minute rule was a general desire to increase "transparency," App. 175-77, which is not even one of the Exchange Act's express purposes, 15 U.S.C. §78b. And, regardless, advancing a statute's purposes at all costs does not make a burden "necessary or appropriate." 15 U.S.C. §78o-4(b)(2)(C); *Am. Petrol. Inst.*, 953 F. Supp. 2d at 21-23; *Michigan*, 576 U.S. at 752.

## V. The SEC failed to adequately assess the Order's impact on small entities.

The SEC also failed to adequately respond to comments about the effect of the Order on small entities. "An agency's failure to respond to relevant and significant public comments generally demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Lilliputian Sys.*, 741 F.3d at 1312 (cleaned up);

*Bloomberg*, 45 F.4th at 476-77. And the Regulatory Flexibility Act "makes the interests of small businesses a 'relevant factor' for certain rules." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). Thus, if a comment raises concerns about the significant impact of an SEC order on small businesses, the SEC must address it and may not "'ignore with impunity the effect of its [order] upon small entities.'" *State of Colo. ex rel. Colorado State Banking Bd. v. Resol. Tr. Corp.*, 926 F.2d 931, 948 (10th Cir. 1991). To properly respond to such concerns, the SEC must describe the effect of the rule on small businesses, discuss regulatory alternatives that would mitigate the impact, and explain why it rejected those alternatives. *See Nat'l Tel. Coop. Ass'n*, 563 F.3d at 540-41; 5 U.S.C. §§603, 604.

Commenters repeatedly "assert[ed] that the proposed rule may significantly injure a substantial number of small businesses." *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1424 (M.D. Fla. 1998); *supra* 13-15; *see, e.g.*, App. 69, 76 (the rule "threaten[s] the participation of small and midsized broker-dealers"); App. 90 ("Given the limits of [the manual trade and limited trading] exceptions, smaller broker-dealers … risk being driven out of the fixed-income markets due to prohibitive costs."); App. 79, 82 ("Small firms … which are incapable of meeting the phased-in time periods, will be eliminated from business."). And these commenters offered regulatory alternatives that would mitigate the harm to small entities, such as expanding the limited trading exception. *See* App. 92.

47

The SEC was thus required to assess the effect of the rule on small broker-dealer firms, including by conducting a regulatory flexibility analysis, and either describe the steps that it took to minimize that impact or explain why it couldn't take mitigating steps. *See, e.g.*, *Lilliputian Sys.*, 741 F.3d at 1312; *Nat'l Tel. Coop.*, 563 F.3d at 540-41; *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42-43 (D.C. Cir. 2005); 5 U.S.C. §604. This consideration would have ensured that the rule's "impact on small businesses [was] reasonable and reasonably explained." *Nat'l Tel. Coop.*, 563 F.3d at 540-41.

But the SEC failed to adequately assess the effect of the rule on small businesses, which is reversible error. *U.S. Telecom Ass'n*, 400 F.3d at 42. The SEC never once referred to small broker-dealer firms in its discussion and findings. *See* App. 175-77. It described the rule's impact on those firms in a single oblique sentence. App. 176 ("[T]he costs associated with complying with a shortened reporting timeframe … could lead some dealers to exit the market, curtail their activities or consolidate with other firms."). Despite multiple comments on the subject, the SEC never determined or discussed the effect of the rule on small businesses, including the number of small firms that would be impacted by the rule, how much those firms would be forced to pay in costs, or how many firms would have the resources to absorb those costs rather than being forced to leave the market. App. 175-77; *see* 5 U.S.C. §§603, 604. And the SEC never discussed any regulatory alternatives that would mitigate the impact on small entities—such as expanding the limited trading exception—and whether such alternatives would be feasible. App. 175-77. The SEC simply asserted, without analysis, that any burden on

broker-dealers was "necessary [and] appropriate" to "increas[e] market transparency." App. 176-77.

The SEC's passing recognition of the harms to small firms, with no attempt to analyze them, mitigate them, or explain why they can't be mitigated, "demonstrates that the [SEC's] decision was not based on a consideration of the relevant factors." *Lilliputian Sys.*, 741 F.3d at 1312 (cleaned up). The SEC's failure to adequately assess the rule's impact on small broker-dealer firms in response to comments is arbitrary and capricious. *Id.*; 5 U.S.C. §706(2)(A).

## VI.    The Court should vacate the Order.

The Court should vacate and set aside the Order. "Vacatur is the ordinary APA remedy." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 317 (11th Cir. 2025) (cleaned up); *see Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy."); *see also* 15 U.S.C. §78y(a)(3) (authorizing courts to "set aside" SEC orders). This Court has also recognized that remand without vacatur may be available. *Ins. Mktg.*, 127 F.4th at 317. "When considering whether to vacate and remand, or just remand, [the Court] consider[s] 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Black Warrior Riverkeeper, Inc. v. USACE*, 781 F.3d 1271, 1290 (11th Cir. 2015)). The decision "'to vacate agency action falls within [the Court's] broad equitable discretion.'" *Id.*

49

Here, vacatur is warranted because the Order is the product of an unconstitutionally structured agency proceeding. This constitutional violation is a "serious defect" that warrants vacatur. *Id.*; *see also Jarkesy*, 34 F.4th at 449 (vacating an SEC order because the "agency proceedings below" violated the Constitution); *cf. Cody v. Kijakazi*, 48 F.4th 956, 960 (9th Cir. 2022) ("Given its importance within our Constitution's structure, the Supreme Court has established remedies with bite for Appointments Clause violations." (citing *Lucia*, 585 U.S. at 251-52)). The SEC's many other errors are also serious defects similarly warranting vacatur. *See, e.g.*, *Bus. Roundtable*, 647 F.3d at 1146 (vacating the SEC's rule because "the Commission failed adequately to consider the rule's effect upon efficiency, competition, and capital formation"); *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1205, 1208 (11th Cir. 2022) (setting aside FDA orders when the agency "fail[ed] to consider a relevant factor").

Vacatur also will have no "disruptive consequences." *Ins. Mktg.*, 127 F.4th at 317. As noted, *supra* 18 n.1, the MSRB recently "determined to delay announcing the effective date" for the amendments approved by the Order, MSRB, *Delayed Announcement of Effective Date for Amendment to MSRB Rule G-14 to Shorten Timeframe for Reporting Transactions in Municipal Securities* (Feb. 5, 2025), perma.cc/FC86-TTQQ. That the MSRB is delaying implementing its new rule strongly indicates that there will be no "disruptive consequences" to vacating the Order. *Ins. Mktg.*, 127 F.4th at 317. In any event, broker-dealers are already complying with the MSRB's prior fifteen-minute reporting rule, and there is no evidence that the prior rule has caused any harm to the

50

market. *Supra* 14-15. To the contrary, significant disruption will occur only if the rule goes into effect, imposing new, burdensome compliance costs and forcing small broker-dealers to go out of business. *Supra* 13-15.

## CONCLUSION

The Court should grant the petition and vacate the Order.

Dated: February 27, 2025                    Respectfully submitted,

                                            */s/ J. Michael Connolly*
                                            J. Michael Connolly
                                            Steven C. Begakis
                                            Zachary P. Grouev
                                            CONSOVOY MCCARTHY PLLC
                                            1600 Wilson Blvd., Ste. 700
                                            Arlington, VA 22209
                                            (703) 243-9423
                                            mike@consovoymccarthy.com
                                            steven@consovoymccarthy.com
                                            zach@consovoymccarthy.com

                                            *Counsel for Petitioner*
                                            *American Securities Association*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,992 words, excluding the portions exempted by Rule 32(f), and the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in 14-point Garamond (a proportionally spaced typeface) using Microsoft Word.

*/s/ J. Michael Connolly*
J. Michael Connolly

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

 */s/ J. Michael Connolly*
J. Michael Connolly

**CERTIFICATE OF SERVICE**

I certify that on February 27, 2025, the foregoing Brief was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ J. Michael Connolly*
J. Michael Connolly